**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

TERRANCE ROBERTS,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
CHIEF OF POLICE PAUL PAZEN,
DEFENDANT JOHN DOES 1-3, in their individual capacities,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Terrance Roberts, by and through his attorneys Mari Newman and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

1.     In the summer following the murder of George Floyd, Terrance Roberts led protesters in Denver in voicing their opposition to an epidemic of law enforcement violence against people of color. Mr. Roberts led others in saying names of not just George Floyd and Breonna Taylor, but also chanting the names of lives lost to police brutality closer to home, including De'Von Bailey, Elijah McClain, Marvin Booker, and Michael Marshall. While speaking out against police brutality, Mr. Roberts, a Black man, became a victim of the same police brutality he was protesting.

2.     On July 19, 2020, a group of individuals were holding a Pro-Police/Re-Elect Trump Rally in downtown Denver. In response, Mr. Roberts organized a counter-protest in support of the countless Black and Brown lives that have been terrorized and murdered with impunity by law enforcement. During the event, Mr. Roberts spoke to the crowd regarding police accountability. After speaking on the west side of the Colorado Capitol, Mr. Roberts led a march of the counter-protesters across Civic Center Park. When the march reached the Greek Amphitheater within Civic Center Park, Mr. Roberts and the marchers walked past a group of police officers. Just after Mr. Roberts led the marchers in chants, Defendant John Doe, a Denver Police Department officer approached Mr. Roberts and sprayed him directly in the face with OC spray. When Mr. Roberts was baselessly attacked, he was simply leading the crowd in a peaceful protest. There was absolutely no basis to spray Mr. Roberts directly in the face with OC spray or to inflict any force on him whatsoever. Tellingly, DPD officers did not attack pro-police protesters with chemical weapons on July 19, 2020. The only protesters who were attacked by DPD officers were those like Mr. Roberts who dared to speak out against police brutality.

3.     What Mr. Roberts experienced on July 19, 2020 had played out again and again in the preceding months, as DPD officers used chemical weapons, shot projectiles, and threw grenades indiscriminately against crowds of peaceful protesters and, often, intentionally aimed those chemical weapons, rounds, and grenades at the most vulnerable parts of protesters' bodies (such as their head, chest, neck, and groin) so as to inflict permanent (and potentially lethal) damage.

4.     Defendant City and County of Denver's ("Denver's") actions, while unconstitutional in any context, are even more pernicious here because the use of excessive force targeted peaceful demonstrators who assembled to protest police brutality, specifically the

customary violence that police target at Black Americans. Denver, over the course of months, deployed hundreds of officers into the streets without proper training, supervision, and policies, which led to repeated uses of excessive force against peaceful protesters simply because they were protesting the way police in America operate.

5.      Since the end of the summer of protests following George Floyd's murder, Denver has imposed virtually no accountability for the officers who routinely violated protesters' Constitutional rights. Denver condoned and defended the actions of its officers all the way through a recent trial in which a jury, outraged by the widespread brutality it saw during the George Floyd protests by DPD officers, unanimously awarded a group of eleven protesters fourteen million dollars. Denver has refused to accept even this modicum of accountability and has appealed the jury's well-reasoned decision.

6.      Plaintiff demands that Denver and its police department accept and act in accordance with the principle that Black lives matter equally in our society and stop using indiscriminate or unlawfully targeted force against peaceful protesters exercising their First Amendment rights to assemble, speak, and petition their government for a redress of grievances against out-of-control law enforcement and the repeated murder of Black and Brown Americans by the police.

## PARTIES

7.      At all times pertinent to the subject matter of this litigation, Plaintiff Terrance Roberts was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

8.      Defendant Denver is a Colorado municipal corporation.

9.      At all times pertinent to the subject matter of this litigation, Defendant Paul Pazen

was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Pazen was acting under color of state law in his capacity as Chief of Police of Denver. Defendant Pazen was responsible for supervising Defendants John Does 1-3 and directing their actions during the protest on July 19, 2020.

10.     At all times pertinent to the subject matter of this litigation, Defendants John Does 1-3 were citizens of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendants John Does 1-3 were acting within the scope of their official duties and employment and under color of state law in their capacities as law enforcement officers employed by the DPD.

## JURISDICTION AND VENUE

11.     This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

12.     Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

## FACTUAL ALLEGATIONS

### George Floyd's murder caused an uprising against racist policing.

13.     George Floyd was murdered by Minneapolis police on May 25, 2020.

14.     Minneapolis police officers arrested Mr. Floyd, a 46-year-old Black man, after a convenience store employee called 911 and told the police that Mr. Floyd had bought cigarettes with a counterfeit twenty-dollar bill. Those officers pinned Mr. Floyd to the ground. Then one officer, Derek Chauvin, put his knee on Mr. Floyd's neck. He would choke Mr. Floyd for eight

minutes and forty-six seconds while Mr. Floyd repeatedly told him that he couldn't breathe; while numerous other officers callously looked on and did absolutely nothing; while bystanders pleaded for Officer Chauvin to stop killing Mr. Floyd, while Officer Chauvin mocked Mr. Floyd. Among Mr. Floyd's final words were "please, please, please, I can't breathe." He would die in the street under the knee of the oppressor.

15.     Mr. Floyd's death was emblematic of the diseased, racist system of policing in the United States of America. Officers know that they can violate the law, and constitution, with impunity, and particularly when the victim of their abuse is a person of color. Fellow officers will do nothing more than stand by and watch. And, when someone complains, the police department, police union, and local prosecutors and politicians will circle the wagons in defense of a murderer, simply because he wears a badge and a gun.

16.     Mr. Floyd's murder, and this system, sparked millions of people to gather across this nation, and world, to mourn and call for the abolition of modern policing.

17.     Denver was among the cities where there was a strong reaction to Mr. Floyd's death with thousands of civilians taking to the streets in protest.

18.     George Floyd's murder sparked an entire summer of protests aimed at pushing America to reckon with its ongoing, racist system of policing that continues to cost Black and Brown individuals their lives.

19.     Mr. Floyd's murder hit home for Denverites because of Denver law enforcement's repeated murder and brutalization of people of color without consequence, and its history of racist policing. In Denver, there has been George Floyd after George Floyd. From Marvin Booker to Michael Marshall, and so many others, Denver law enforcement officers have

brutalized people of color with near impunity. Many of the officers who murdered these Black men still patrol the streets and jails of Denver.[1]

20.     Mr. Floyd's murder, and this system, sparked millions of people to gather across this nation, and world, to mourn and call for the abolition of modern policing.

21.     Denver's racist policing is borne out by statistics. Denver law enforcement officers disproportionately use force against Black people. While only 10% of Denver's population is Black, 27% of the use of force incidents in Denver are perpetrated against Black people.

22.     Protesters in Denver held signs, and chanted names, condemning this long, sordid history of law enforcement brutality against Black men and other people of color. Protesters called for an end to the racist policing that Denver has condoned for decades. Those at the protests voiced their disgust with Denver's lawless law enforcement officers.

23.     From the beginning, the protests against police brutality in Denver were met with the very thing they were protesting: more police brutality. And, that brutality continued throughout the summer of protests.

**Terrance Roberts was brutalized by Denver Police at a Black Lives Matter protest on July 19, 2020, just like countless others before him during the 2020 summer of protests.**

24.     Terrance Roberts is a well-known activist in Denver. He has worked for decades on racial justice issues in the Denver metropolitan area.

25.     Mr. Roberts helped found the Frontline Party for Revolutionary Action ("FPRA") in the summer of 2020 in response to the murders of George Floyd and Elijah McClain by law enforcement officers. During the summer of 2020, Mr. Roberts and FPRA organized, or helped

---

[1] For example, one of Michael Marshall's murderers became a DPD officer; one of Marvin Booker's killers was only finally fired years later after being caught having a drag race and driving over 100MPH with a van full of inmates.

organize, a number of actions to call attention to the American system of racist policing and Colorado's particular problems with racism and brutality within its police departments.

26.     On July 19, 2020, a group of pro-police individuals staged a rally in support of law enforcement and the re-election of Donald Trump. Many individuals, including Mr. Roberts, who had been protesting police brutality and the police murder of Black and Brown individuals throughout the summer of 2020 saw this rally as an affront to their efforts to hold police officers accountable for their violent and brutal actions. In response to this rally, Mr. Roberts, FPRA, and others organized a counter-protest in support of Black and Brown lives who had been terrorized and murdered with impunity by law enforcement.

27.     The counter-protest organized by Mr. Roberts, FPRA, and others began on the west side of the Colorado Capitol at approximately 2:00 p.m. On the steps of the Capitol, Mr. Roberts spoke to the gathering crowd about police accountability and against the re-election of Donald Trump. After Mr. Roberts and others finished speaking, they led the crowd on a march through Civic Center Park, where the pro-police rally was taking place.

28.     As Mr. Roberts marched through Civic Center Park, he was confronted and assaulted by multiple members of the pro-police rally. Mr. Roberts was pushed and shoved by the pro-police contingent simply because he was speaking out against police brutality. Mr. Roberts was assaulted directly in front of multiple DPD officers, however, these officers did nothing to stop the assaults. It was clear to Mr. Roberts that he could not rely on DPD officers for protection; they were there only to ensure that the pro-police rallygoers felt as though they could engage in violence against the counter-protesters with impunity.

29.     In fact, the DPD officers on-scene formed a protective bubble around the pro-police rally attendees. It was clear that DPD officers were at the rally to only protect the pro-

police rally attendees. This was clearly the case because the DPD officers agreed with the pro-police rally's message, and opposed the message of the counter-protesters led by Mr. Roberts and his colleagues.

30.    Despite the threat of further assault from the pro-police rally attendees, Mr. Roberts continued the march across Civic Center Park. Mr. Roberts and others peacefully continued to voice their opposition to the pro-police rally by engaging in chants, banging on pots and pans, and otherwise making their opposition to the pro-police rally known.

31.    Near the end of the pro-police rally, Mr. Roberts led the marchers through the park leading chants over a bullhorn against police brutality and racism within the ranks of police departments. Mr. Roberts and the others were near the Greek Amphitheater portion of Civil Center Park, and a large group of DPD officers were in between Mr. Roberts and the pro-police group.

32.    As Mr. Roberts led the marchers in chants, one DPD officer, John Doe, approached Mr. Roberts and sprayed him directly in the face with OC spray while two other DPD officers, John Doe 2 and John Doe 3, looked on and did nothing to intervene. All of the DPD officers were in full riot gear with gas masks on so as to conceal their identity. They were not wearing badges or nametags that would indicate their identity. At the time Mr. Roberts was sprayed in the face by John Doe, he was over fifteen feet away from the pro-police rally attendees and had been leading chants with a bullhorn.

33.    When Defendant Doe approached Mr. Roberts and sprayed him directly in the face with OC spray, he did so without any warning. Mr. Roberts observed that as Defendant Doe looked angry as he approached Mr. Roberts. It was clear to Mr. Roberts that Defendant Doe

knew that Roberts was a leader of the counter-protest and that Defendant Doe sprayed him in the face because he was leading a group opposing the pro-police rally.

34.     Being sprayed in the face with OC spray caused Mr. Roberts extreme pain. His face burned and he was unable to see. Mr. Roberts retreated away from Defendant Doe and others from the march helped him wash his face. Even after washing the OC spray out of his face, Mr. Roberts' eyes still burned. Mr. Roberts' eyes would continue to burn for multiple days after the incident.

35.     After being attacked with OC spray, Mr. Roberts left the counter-protest and did not return. Defendant Doe's actions chilled Mr. Roberts from continuing to assemble and speak out against the pro-police rally.

36.     When Mr. Roberts was baselessly attacked, he was simply leading the crowd in a peaceful protest march. Mr. Roberts was not committing any crime. Mr. Roberts was not engaged in any behavior that could be considered violent or threatening. There was absolutely no basis to spray Mr. Roberts directly in the face with OC spray.

37.     Tellingly, DPD officers did not attack pro-police protesters with chemical weapons on July 19, 2020. Mr. Roberts did not see any DPD officers use force against any of the pro-police rally attendees throughout the day, even though the pro-police rally attendees assaulted a number of people there for the counter-protest. The only protester who was attacked by DPD officers was Mr. Roberts, who dared to speak out against police brutality.

**DPD officers have a history of indiscriminately shooting crowds of peaceful protesters with chemical weapons.**

38.     On October 29, 2011, Denver police officers responded to a peaceful protest by indiscriminately shooting protesters with chemical weapons, including pepper balls. Denver police officers fired a number of these rounds at people who were lawfully dispersing. Not only

did Denver police officers shoot chemical weapons, including pepper balls, indiscriminately into the crowd of peaceful protesters, but they also routinely targeted individuals' faces. For example, Denver police officers shot Philip Becerra in the face with a pepper ball. Mr. Becerra suffered facial injuries on the bridge of his nose, less than an inch from his left eye. Mr. Becerra could have easily been blinded in that eye, or even killed, by this indiscriminate use of force.

39.     After the October 29, 2011, incident, the ACLU of Colorado sent a letter outlining the concerns associated with the use of indiscriminate force by DPD officers to Denver.

40.     Despite being notified of these grossly excessive uses of force and the widespread nature of it, Denver did not provide further training to its officers or discipline any officer involved. Denver's ratification of this indiscriminate use of force by its officers signaled to DPD officers that such force was consistent with Denver's customs, policies, practices, and training, and that DPD officers can use such force without any risk of discipline.

**DPD officers purposefully and customarily used indiscriminate force against peaceful protesters during the George Floyd protests.**

41.     On May 28, 2020, Michael Acker, a young Black college student, was peacefully protesting in a march from the Capitol building to I-25. There, he watched from the pedestrian bridge as other protesters marched onto I-25. DPD officers formed a police line on the west side of Platte Street near the pedestrian bridge. At this point, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a KIP at Mr. Acker's head, striking him in his right eye. It shattered the glass

10

eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. Over a month after the injury, Mr. Acker continued to experience foggy vision, light sensitivity, inability to read, and difficulty tracking movement in his right eye. Mr. Acker settled his claims against Denver for $500,000.



*Mr. Acker moments after being shot in the eye.*

42.     On May 28, 2020, while he was covering the protests rally at the State Capitol. Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me.*"*



*Hyoung Chang's arm after being shot.*

43.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP. While at the protest, Mr. Thorn served at times as a medic. Mr. Thorn is a veteran who served in the Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, DPD officers targeted him and shot pepper balls. He witnessed DPD officers utilize rubber bullets, tear gas, flash-bang grenades, and pepper balls. The protesters were attacked indiscriminately with these ordinances and without regard for safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was struck that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When Mr. Thorn was struck with rubber bullets,

12

as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time.

44.     On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball.

45.     On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol. When she was shot in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance.



*Megan Matthews after being shot in the eye.*

46.     On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7, was struck four times by KIPs fired by DPD officers in the chest. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level.



*What the camera looked like after being shot.*

47.     On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round while standing beside a professional cameraman from that station. The round struck Mr. Jojola's backpack.

48.     On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer was standing in a group of press photographers when a law enforcement officer kicked a pepper gas canister directly into her face.



*Lindsay Fendt after having a tear gas canister kicked into her face.*

49.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with KIPs without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a medic to attend to those injured by the police. At one point, the Police excessive tear-gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick, that it was a cloud that could not be seen through. Mr. McDaniel saw a protester crawling out on his hands and knees. The protester was choking and could not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with KIPs. Thankfully, Mr. McDaniel was wearing a helmet, so when the police

aimed at his head, they did not cause any injury, other than the intense burning pain that Mr.

McDaniel experienced as a result of the pepper balls.

50.      On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a KIP

without warning. Prior to the curfew, DPD officers shot Ms. Epps with rubber bullets during a

peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without

warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was

wearing and wounding her face. A federal jury awarded $1,000,000 to Ms. Epps after a three-

week trial with $250,000 of the verdict awarded because a jury determined that a DPD officer

used force against her in retaliation for her free speech activity maliciously and/or in reckless

disregard of her federally protected rights.



*Elizabeth Epps after being shot in the face.*

51.     On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a KIP without warning. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the back of a DPD truck fired a projectile at his face without warning and blinded him in one eye. Mr. Feldmann, a 21-year-old delivery driver with Denver's River Bear American Meats, was walking about 9:30 p.m. from his friend's apartment at Grant Street and Colfax Avenue to his car parked a block away on Sherman Street. It was the first night that Denver was under an 8 p.m. curfew due to ongoing protests of police brutality, but Feldmann was trying to get home. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. Mr. Feldmann didn't see what hit him, but that reached his hand up to his face and felt blood. His friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. The surgeon who operated on Feldmann's eye told Mr. Feldmann's mother that the damage was consistent with a rubber bullet.



*Jax Feldmann after being shot in the eye.*

52.     On May 30, 2020, DPD officers shot former Major League Baseball star Dale

Murphy's son in the eye with a KIP without warning. Mr. Murphy's son was peacefully

protesting in downtown Denver. After being shot, he was taken to the emergency room.



*Mr. Murphy's son after being shot in the eye.*

53.     On May 30, 2020, DPD officers without warning shot Russell Strong in the head

with a KIP. Mr. Strong was protesting near Civic Center Park and carrying a sign that read "No

justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a KIP. The force of

the KIP knocked him out. As a result of this use of force, Mr. Strong required several facial

reconstructive surgeries to repair broken bones around his eye and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot, Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction.

54.     On Saturday, May 30, 2020, DPD officers without warning sprayed Stanford Smith in the face with pepper-spray for no identifiable reason other than he was exercising his free speech rights. Mr. Smith arrived at the protests near the Capitol at about 4 p.m. He was there to stand in solidarity with those who were demonstrating against police violence and to exercise his own First Amendment right to protest. When he arrived, he joined a large crowd of protesters chanting, "I can't breathe" and "Don't shoot!" Most protesters had their hands in the air. Mr. Stanford did not see anyone throw anything at officers. About five minutes after Mr. Smith arrived, officers dressed in riot gear standing near a Denver Police Department surveillance truck shot cannisters of tear gas into the crowd. Officers did not offer a warning before firing the tear gas. Because of the effect of the tear gas, Mr. Smith left the immediate area. At about 7 p.m., Mr. Smith was standing with a group of protesters near Civic Center Park. Mr. Smith became fearful as officers formed a single file line and encircled the area, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, Mr. Smith began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. One Black officer thanked Mr. Smith for trying to keep the peace. As Mr. Smith was talking to protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed Mr. Smith directly in his face with

pepper spray. The officer did not give any warning before spraying the pepper spray in his face.

Mr. Smith feared for his life: he could not see, and he felt as though his face was on fire. He tried

to run for safety, and protesters grabbed him by the arms and led him to the grass. They poured

milk in his eyes and on his face. Mr. Smith felt severe pain. His vision remained blurry, and he

tripped on the curb on the way home. A bystander called paramedics, who poured solution on

Mr. Smith's face to help with the burning. At first, Mr. Smith was fearful of the paramedics

because he thought they were the police. He collapsed on the floor when he finally got home and

needed his roommate to pour more water on his face. His face remained red for several days, and

his skin eventually peeled. Mr. Smith took his claims for excessive force and violation of his free

speech rights to trial against Denver, and a jury found that Denver violated his rights and

awarded him $1,000,000.



*Mr. Smith immediately after being pepper-sprayed in the face.*

55.     On May 30, 2020, DPD officers shot Darrell Hampton in the face with KIPs

without warning. Mr. Hampton was peacefully protesting, and filming DPD officers, on the

sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back

of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to randomly shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers.



*Mr. Hampton being hit in the face with the pepper ball.*

56.     On May 30, 2020, Lindsay Minter helped to organize and lead a peaceful march in response to the video of the brutal police murder of George Floyd that had been released a few days earlier. Ms. Minter, a Black woman who is outspoken about police brutality, wished to draw attention to the routine violence against Black bodies by law enforcement officers both in the state of Colorado, and nationwide. Ms. Minter was very involved with organizing to bring light to the injustice of Elijah McClain's murder, and the complete lack of accountability for officers in that case. From Ms. Minter's perspective, Mr. Floyd's death was just the latest example of a system of policing that does not value Black life. Ms. Minter is a veteran organizer of direct actions who is well-known within the community. She regularly speaks at actions protesting police violence. Ms. Minter is known by police departments throughout the Denver metropolitan area as someone who

is critical of police departments and their officers. On the morning of May 30, 2020, Ms. Minter headed to downtown Denver to help lead a protest against the DPD, and other law enforcement. Ms. Minter parked her car just north of the Capitol and walked toward the Capitol grounds. When she arrived at the Capitol grounds, she met with Colorado State Representative Leslie Herod and Denver Public Schools Director Tay Anderson. Ms. Minter arrived at the Capitol and met with Representative Herod and Director Anderson around noon. After arriving at the Capitol, Ms. Minter, along with Representative Herod and Director Anderson, helped lead others who had gathered on a march throughout downtown Denver. Those marching were a calm crowd, many people wearing face masks for protection against COVID-19 and carrying signs protesting Mr. Floyd's murder at the hands of Minneapolis police. When the march arrived back at the Capitol, water bottles were handed out, and state Representative Herod and Representative James Coleman, both Denver Democrats, led choruses of "Black Lives Matter" and "Hands up, don't shoot" chants. Director Anderson also spoke to the crowd. His remarks included a reminder to protesters not to engage in any conduct that would detract from their message. At one point during the rally, peaceful demonstrators laid down for nine minutes, their hands behind their backs, chanting "I can't breathe," memorializing Mr. Floyd with some of the final words he uttered as Officer Chauvin pressed his knee into the back of his neck until he lost consciousness and died. Around 1:30 p.m., Natalia Marshall and her daughter were given sunflowers by activists in honor of her uncle, Michael Marshall, on the steps of the Capitol. Mr. Marshall was killed by Denver Sheriff's deputies who pinned him to the ground and covered his mouth with a spit hood, causing him to choke on his own vomit. There were multiple purposes for the gathering. They were a place for members of the black community to feel safe and express their grief together. Ms. Minter, and others, were demonstrating in an attempt to spur change and make sure that all of their kids were

safe from police violence. At the end of the rally at the Capitol, Ms. Minter addressed the crowd.

She gave a speech and led the crown in the Assata chant. Together, Ms. Minter and the crowd

chanted: "It is our duty to fight for our freedom. It is our duty to win. We must love each other and

support each other. We have nothing to lose but our chains." After the Assata chant, the rally

largely dispersed, and some members of the rally left the Capitol to begin marching throughout

downtown Denver. Ms. Minter left the Capitol grounds after leading the Assata chant. Ms. Minter

walked north from the Capitol toward her car so that she could drive home. As she walked north,

Ms. Minter witnessed DPD officers in riot gear, standing both on the street and on the back of a

Rapid Deployment Vehicle ("RDV"), confront a group of individuals who were continuing to

march through Denver. Ms. Minter noticed that these individuals were simply attempting to march

down the street when the DPD officers blocked their way and were trying to prevent them from

marching. The protesters were calm and chanting at the officers, "Why are you in riot gear? We

don't see no riot here." The police line had formed so quickly that there was no way for Ms. Minter

to return to her car without passing by it. Denver police did not provide Ms. Minter with any

warning or direction for a route to disperse prior to inflicting force against her. As she attempted to

reach her car, Ms. Minter witnessed a DPD officer throw a grenade directly next to her while other

DPD officers shot projectiles indiscriminately at and near Ms. Minter. After the grenade exploded

and the officers fired their projectiles at Ms. Minter and the crowd, Ms. Minter was hit in the face

with a projectile. The impact shocked Ms. Minter and she immediately grabbed her face. Ms.

Minter continued to her car. By the time she reached it, her face was swollen. Ms. Minter had

significant pain in her jaw and was concerned that she would lose some of her teeth. After being

injured by the Sting Ball grenade and projectiles fired by the officers, Ms. Minter went to see a

doctor at Aurora Medical. Ms. Minter felt like the teeth on the left side of her mouth were about to

fall out. After determining that she did not have any broken bones, Ms. Minter was referred to a dentist. While awaiting her dentist appointment, Ms. Minter was treated by her primary care physician for jaw pain, facial swelling, and infection. Ms. Minter's dentist eventually determined that one of her teeth had been broken below the gum line, and was forced to pull the tooth and insert a bone graft. There was no basis for Denver officers to throw the Sting Ball grenade at Ms. Minter or to shoot at her with projectiles. At no point during her time in Denver on May 30, 2020, did Ms. Minter violate any law, engage in any activity that could perceived as threatening law enforcement officers or others, resist arrest in any way, or damage any property in any way. When Ms. Minter was hit with the Sting Ball grenade she was simply walking back to her car after the march. She, like countless others who Denver officers hit with projectiles and seriously injured during the George Floyd protests, was simply peacefully protesting police brutality when she was shot

57.   On May 31, 2020, DPD officers used excessive force against Robert Dayton. Mr. after seeing the George Floyd protests in Denver covered on the news and hearing explosions from his apartment. Mr. Dayton went to observe the protests in the evening. Mr. Dayton wished to get an unbiased, firsthand look at the way police were responding to the protesters. When Mr. Dayton arrived at the protests, which were happening on Colfax Avenue, he saw that DPD officers were aggressively advancing on the protesters and indiscriminately shooting at them with Kinetic Impact Projectiles ("KIPs"), including 40mm rounds and pepper balls. Mr. Dayton did not observe the protesters engaging in any unlawful behavior. There was no property destruction or aggression against the police by protesters. Mr. Dayton was shocked to see DPD officers using force against peaceful protesters, so he decided to join the protesters to express his belief that this violent reaction by the police was wrong. After Mr. Dayton joined the crowd of

protesters, DPD officers continued to indiscriminately shoot pepper balls and other KIPs into the

crowd. Mr. Dayton was hit multiple times by pepper balls shot by DPD officers near the

intersection of Colfax Avenue and Emerson Street. When Mr. Dayton was shot with pepper

balls, he was not engaging in any property destruction, committing any crime, threatening any

law enforcement officer (or anyone else), or attempting to flee arrest. When Mr. Dayton was shot

with pepper balls he was peacefully protesting. Prior to being shot with pepper balls, DPD

officers never issued a warning of any kind that pepper balls would be deployed or that Mr.

Dayton, specifically, should cease engaging in any conduct or risk being shot with pepper balls.

Mr. Dayton was given no warning whatsoever prior to being pelted with pepper balls. Even after

being shot with pepper balls, Mr. Dayton sat down in pain to demonstrate that he was not being

aggressive in any way towards the DPD officers in front of him or the community surrounding

him even as the officers continued their aggression toward Mr. Dayton and his fellow protesters.

Mr. Dayton was sitting in the middle of a crowd of peaceful protesters near the intersection of

Colfax Avenue and Emerson Street. As Mr. Dayton was sitting down, DPD officers again began

advancing on the crowd. The DPD officers began, again, deploying KIPs indiscriminately into

the crowd. There was no announcement or warning prior to the deployment of the KIPs. Mr.

Dayton noticed that others around him were turning around to disperse from the aggressively

advancing officers. Seconds after DPD officers began advancing on the crowd of peaceful

protesters, one of the officers threw a flash-bang grenade directly at Mr. Dayton, who was still

sitting in the middle of the crowd. The flash-bang grenade struck Mr. Dayton directly in his left

elbow. Immediately after hitting Mr. Dayton's elbow, the flash-bang grenade exploded, searing

Mr. Dayton's eyes and causing him significant pain in his elbow. Prior to deploying the flash-

bang grenade, DPD officers never issued a warning that a flash-bang grenade would be

deployed. DPD officers did not allow Mr. Dayton time to retreat from the deployment of the grenade nor did they instruct him on where he needed to go to avoid being subject to the grenade. When Mr. Dayton was hit with the flash-bang grenade, he was not engaging in any property destruction, committing any crime, threatening any law enforcement officer (or anyone else), or attempting to flee arrest. When Mr. Dayton was hit with the flash-bang grenade, he was peacefully protesting. Because of Defendants' actions, Mr. Dayton suffered numerous damages. He endured enormous pain in his elbow. For a while, Mr. Dayton was limited in his ability to work and needed to work odd intermittent hours to keep up with his full-time job due to his difficulty typing with his left arm. For a while, Mr. Dayton was also unable to work his side business of electronics assembly as a result of his injuries and eventually closed it the next year. There was no basis to shoot Mr. Dayton with KIPs or to throw a flash-bang grenade directly at him. He, like countless others who were shot with projectiles and seriously injured during the George Floyd protests, was simply peacefully protesting police brutality when he was shot and grenaded.



*Mr. Dayton's elbow after being hit with the flash-bang.*

58.     On May 31, 2020, Gabe Schlough was shot in the face with a KIP by DPD officers without warning. Mr. Slough, an individual with a degree in public health anthropology who some had medical training and had participated in protests before, attended the protests near the state Capitol with the intention of being there help anyone who was injured by the DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. They were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with KIPs. Mr. Slough described the sensation as getting his with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The KIP had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required 22 stitches to close the wound on his chin. He still experiences pain from this wound and will likely require plastic surgery for it to heal properly.



*Gabriel Schlough's chin after being shot.*

59.     On May 31, 2020, Zachary Packard was shot in the head with a KIP by DPD

officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at

about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the

groups of protesters. Mr. Packard heard a message from a SWAT vehicle that "curfew was in

effect." DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas

canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard

was hit in the head with a projectile. He was immediately knocked unconscious. DPD officers

did not issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard

from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took

him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and

jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week. A jury found that Denver violated Mr. Packard's First and Fourth Amendment rights, and awarded Mr. Packard $3,500,000 after a three-week trial.



*Zachary Packard after being shot in the head*

60.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with KIPs without warning. Well before curfew, Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first

shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD officers shot them approximately 14 times. The DPD officers did not give any orders before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree.

61.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by law enforcement and shot in the head and abdomen with KIPs. DPD officers fired at Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right abdomen.



*Alex Burness after being shot in the abdomen*

62.     On May 31, 2020, DPD officers shot Darian Tindall in the chest with KIPs without warning. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD.

63.     On May 31, 2020, DPD officers shot at Trevor Hughes face with KIPs without warning. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at approximately 8:30 p.m. While recording, with the camera near his face, DPD officers shot Mr. Hughes in the hand with a KIP. The shot broke and partially severed Mr. Hughes's right ring finger, leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes had to have his finger surgically repaired.

64.     On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning. As a photographer and freelance journalist, Mr. Cruz wanted to document the protests as well as the police response. Throughout the evening, he documented the protests and police action. At about 8:00 p.m., he was with protesters in front of the Capitol. The protesters were chanting and peaceful. There were over one hundred people present. There was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and foam bullets at the protesters. They did not give any warning or orders. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas. At approximately 13th Avenue, he saw a man in an electric wheelchair. The man was stuck and Cruz tried to give him a hand. However, the wheelchair was extremely heavy. Unfortunately, Cruz had to leave him there while he was being engulfed by tear gas. Mr. Cruz ran towards the library. Around 13th Avenue, the DPD officers were shooting at him and protesters with tear gas

and pepper balls. There were a lot of people who were trying to leave to go home. There were approximately 35 people at that corner, and they were all younger protesters, including teenagers. Almost all of them were Black. One protestor was having a seizure. Mr. Cruz and others tried to help him. Some people tried to leave, but DPD officers cornered them and shot pepper balls at them. A white person went up to the DPD officers to ask if they could leave because people wanted to go home. The DPD officer said that they could go home, and so people started walking towards where the officer told them to go. That officer started firing on people and everyone started running. Mr. Cruz ran with other protesters to a building and garage at 13th Avenue and Lincoln. The DPD officers ran after them. The DPD officers were shooting them with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran down to the garage but discovered that armored vehicles blocked off both ends of the block and there was no exit. Cruz ran up the stairs, and as he looked up, a Defendant DPD Officer shot him in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Mr. Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Mr. Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and other problems with his eyesight.

65.     DPD officers violated the First and Fourth Amendment rights of Amanda Blasingame and Maya Rothstein on multiple occasions during the George Floyd protests. At

about 8 p.m. on May 28, 2020, Ms. Blasingame and Ms. Rothlein were gathered in a crowd of protesters outside of a police station near the Capitol. They were there to exercise their First Amendment right to protest and to stand in solidarity with those demonstrating against police violence. Though they witnessed some protesters throw things at the building, they did not observe any protesters throw anything at officers. As police marched from the station parking lot into the street, they released tear gas and shot rubber bullets into the crowd. Officers did not issue any warnings prior to using these tactics. Later that night, at about 9:30 p.m., a large group was chanting in the street. After one individual threw a single plastic water bottle toward the police, officers tear gassed the entire crowd and continued using tear gas to move the group up the street. On May 30, 2020 at about 5:30 p.m., Ms. Blasingame was gathered in a large crowd outside of the Colorado State Capitol building. Ms. Blasingame, along with the rest of the crowd, was on her knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and pepper bullets at the crowd without giving any warning. Ms. Blasingame returned home to comply with the 8 p.m. curfew. She and Ms. Rothlein gathered in their front yard with some neighbors. When a police car followed by a line of SWAT vehicles drove down their street, one neighbor yelled at the police car. The police car and the SWAT vehicles stopped and the officers exited their vehicles. While the officers in SWAT gear stood in the street holding weapons, one officer came up to Ms. Blasingame and Ms. Rothlein's fence and began threatening to pepper spray them while they sat on the steps of their own home. While holding the pepper spray up and pointing it at them, the officer stared directly at Ms. Rothlein, who was the only Black person in the front yard. Only after Ms. Blasingame reminded the officer of their First Amendment rights did the officer leave. Later that night, a SWAT vehicle drove down the street in front of Ms. Blasingame and Ms. Rothlein's home.

Someone again shouted at the SWAT vehicle to leave their neighborhood. From the SWAT vehicle, officers shot pepper bullets directly at Ms. Blasingame and Ms. Rothlein where they were sitting on the front steps of their apartment. Pepper bullets hit the front door and even entered the apartment building. Ms. Blasingame and Ms. Rothlein retreated to the mail room of their apartment complex out of mortal fear only to find the mail room filled with what appeared to be a gas-like substance. They could not enter the mail room for several days thereafter. Another pepper bullet hit one of Ms. Blasingame and Ms. Rothlein's neighbors, who was coughing and vomiting for over an hour after being hit. Ms. Blasingame and Ms. Rothlein sued Denver for a violation of their Constitutional rights and eventually went to trial on their claims. A federal jury found that Denver violated Ms. Blasingame's and Ms. Rothlein's First and Fourth Amendment rights and awarded them $1,000,000 each.

66.     DPD officers violated the First and Fourth Amendment rights of Ashlee Wedgeworth on multiple occasions during the George Floyd protests. Ms. Wedgeworth participated peacefully in protests in Denver every day from May 28, 2020 through June 4, 2020, and witnessed Officers in Denver exerting excessive force on several days she attended. She attended protests to stand in solidarity with those demonstrating against police violence and to exercise her own First Amendment rights. On the evening of May 29, 2020, Ms. Wedgeworth and a friend arrived near the Colorado state Capitol building to participate in the protest. Ms. Wedgeworth observed some individuals, who were standing far away from Ms. Wedgeworth, throw something in the direction of officers. In response, officers began shooting projectiles at those individuals, but then also turned and shot at Ms. Wedgeworth and her friend with pepper balls. The pepper balls hit Ms. Wedgeworth's friend, and the resulting dust rendered Ms. Wedgeworth unable to breathe. Ms. Wedgeworth and her friend were not standing anywhere

near the individuals who had thrown the objects. Officers did not offer a warning prior to shooting. On May 31, 2020, Ms. Wedgeworth experienced tear gas at night, when she was marching with a crowd of protesters on the streets surrounding the Capitol. The protesters were chanting and marching. Some protesters at the front of the march were laying down in the street, like George Floyd, but none were throwing items or being violent. Officers did not issue a warning before releasing the tear gas. Due to the tear gas, Ms. Wedgeworth's face, eyes, nose, and mouth felt like they were burning; she could not see; and she was coughing a lot. On the evening of June 1, 2020, when Ms. Wedgeworth was protesting at the Capitol, officers formed a line in front of the Capitol and began pushing crowds into the street. Ms. Wedgeworth felt as though officers were trying to corral all of the protesters into one area. Then, once the protesters were corralled, officers release tear gas without warning. Ms. Wedgeworth again could not see, she was coughing, and her face felt like it was burning. Ms. Wedgeworth attended the protests again on June 2, 2020. That night, officers again released tear gas into the crowd of protesters. Ms. Wedgeworth also witnessed officers shoot projectiles that appeared to be pepper balls at protesters. As a result of the tear gas and pepper ball dust Ms. Wedgeworth inhaled on May 29, May 31, June 1, and June 2, 2020, Ms. Wedgeworth suffered pain and difficulty breathing, as well as burning in her nose, eyes, and on her face for a few hours after being gassed. Ms. Wedgeworth sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Wedgeworth's First and Fourth Amendment rights, and awarded her $750,000.

67.    DPD officers violated the First and Fourth Amendment rights of Hollis Lyman on multiple occasions during the George Floyd protests. On May 28, 2020, at about 8:30 p.m., Ms. Lyman arrived at the area of the State Capitol to exercise her First Amendment right to protest

and to stand in solidarity with those demonstrating against police violence. She joined a crowd of protestors by the Capitol but was quickly pushed down a street near the Capitol by Officers. Officers tear gassed the entire crowd and Ms. Lyman felt like the tear gas was everywhere around her. Her eyes watered, and she coughed and gagged several times. Ms. Lyman did not hear officers issue a warning before releasing the tear gas. On May 29, 2020, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" Ms. Lyman observed police cars drive through the group and release tear gas and pepper balls from the vehicles. Ms. Lyman's eyes began to burn, and she ran away from the group to rinse her eyes with milk. Later, after returning to the protest, she used her sign as a shield to protect her from pepper balls. One pepper ball pierced through the sign, hitting Ms. Lyman and bruising her arm. On March 30, 2020, Ms. Lyman heard protest organizers encouraging peaceful protests. At about 3:30 p.m., Ms. Lyman observed officers shooting pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, officers shot more pepper balls as well as grenades at protesters. One grenade hit Ms. Lyman's friend in the leg and made a deafeningly loud sound. Ms. Lyman became disoriented from the sound. Ms. Lyman and her friend had difficulty hearing for the rest of the night. Ms. Lyman also observed officers pull a boy's goggles and mask off of his face before spraying him in the face with pepper spray. Because Ms. Lyman desired to protect the people of color who were attempting to protest, Ms. Lyman returned to the protest area on Saturday night, at times placing herself between the police and people of color who were protesting. As Ms. Lyman and a friend were walking toward a group of protestors at the Capitol that night, Officers in Denver routed them through a particular street. Ms. Lyman and her friend complied with the directions, but Officers shot Ms. Lyman in the back repeatedly with pepper balls anyway, as she tried to protect her friend. She struggled with gagging and nausea

after inhaling gas and, after she returned home that night, Ms. Lyman threw up. Ms. Lyman sued

Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found

that Denver violated Ms. Lyamn's First and Fourth Amendment rights and awarded her

$1,000,000.

68.     DPD officers violated the First and Fourth Amendment rights of Kelsey Taylor on

multiple occasions during the George Floyd protests. On May 28, 2020, Ms. Taylor marched

with protestors in the downtown area and north towards I-25. After the protestors got off the

highway, protestors headed back towards the Capitol. There were over one hundred people.

Around Platte and the pedestrian bridge near Confluence Park, protestors stood there. Ms. Taylor

heard one DPD officer say something to the effect of, "If anyone moves, light 'em up." DPD

officers began shooting pepper balls at the protestors without warning or any orders. Many

people were injured. Ms. Taylor marched back to the Capitol with other protestors. At 14th

Avenue and Sherman, there was a line of DPD officers on 14th Avenue. Ms. Taylor and the

other protestors stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't

breathe." Another group of protestors walked down 14th Avenue and joined Ms. Taylor's group

of protestors. There were approximately two hundred people. At some point, the DPD officers

tear gassed the entire crowd, without provocation. Ms. Taylor did not see anyone throw anything

or get aggressive with the police. DPD officers gave no warning or orders. Ms. Taylor inhaled

tear gas, which caused breathing and vision problems. On May 30, 2020, Ms. Taylor went to the

Capitol at around 5:00 or 6:00 p.m. to protest. She stood with other peaceful protestors on 14th

Avenue in front of the Capitol building. Any time there was the slightest agitation in the crowd,

even if it was non-violent, the DPD officers started shooting pepper balls and throwing tear gas

without giving any warnings or orders. The DPD officers also shot into the crowd whenever

protestors walked forward closer to Colfax. Ms. Taylor was hit by pepper balls, which caused bruises. She also inhaled tear gas. After curfew, at 14th Avenue and Broadway by the public library, Ms. Taylor was with approximately one hundred other demonstrators protesting the curfew itself. Ms. Taylor and the other demonstrators knelt in the intersection of 14th Avenue and Broadway. The DPD officers formed a line. They were in full riot gear and had batons and/or truncheons. They advanced towards the protestors. Ms. Taylor and the others remained kneeling. They began jabbing people, including Ms. Taylor, with batons. Ms. Taylor saw a DPD officer hit a Black man across his chest with his baton. Ms. Taylor said words to the effect of, "You can't do that, he's not hurting you, he's unarmed." Another DPD officer grabbed Ms. Taylor's arm and told her that she was under arrest. Ms. Taylor heard another officer say, "Get me three more." Ms. Taylor sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Taylor's First and Fourth Amendment rights and awarded her $1,000,000.

69.     DPD officers violated the First and Fourth Amendment rights of Sara Fitouri and Jacquelyn Parkins on multiple occasions during the George Floyd protests. On or around 5:00 p.m. on May 28, 2020, Ms. Parkins went to the Capitol building and participated in the protests. When some of the protestors began marching north, Ms. Fitouri joined Ms. Parkins as Ms. Parkins marched with them. The protest was peaceful. Ms. Fitouri and Ms. Parkins marched through Confluence Park toward I-25 with the rest of the marchers. On or around 7:00 p.m., they observed the DPD officers fire dozens of pepper balls on the group of protestors on the highway. At that time, Ms. Fitouri and Ms. Parkins were on a pedestrian walkway over I-25. They inhaled pepper spray from the pepper balls while on the walkway. When they rejoined the march heading back downtown, they inhaled tear gas and/or pepper spray that DPD officers had used on

protestors in that area. On or around 1:00 p.m. on May 29, 2020, Ms. Fitouri and Ms. Parkins arrived at or near the Capitol to join the protest and march. They marched with the other protestors, who were peaceful. The march went to several locations, including the City and County Building and the jail. At approximately 8:00 p.m., Ms. Fitouri and Ms. Parkins and other protestors were at the intersection of Colfax and Broadway. The group was peaceful. Someone in the group may have lofted a water bottle into the air. Rather than investigate and isolate that person, DPD officers indiscriminately opened fire with tear gas and pepper balls at the entire group of protestors, including Ms. Fitouri and Ms. Parkins, without warning or order to disperse. Once the initial pepper spray rounds were fired, the DPD officers continued to use pepper balls, tear gas, and flash-bang grenades on the protestors, including Ms. Fitouri and Ms. Parkins, from the corner of Broadway and Colfax, as well as multiple other locations on and around the Capitol. At one point, the DPD officers used pepper balls, tear gas, and flash-bang grenades to push protestors southeast of the Capitol into the surrounding neighborhoods. Ms. Fitouri and Ms. Parkins, along with another group of protestors, inhaled significant amounts of pepper spray and tear gas during this offensive move. Ms. Fitouri and Ms. Parkins saw many injured protestors at this time, including one woman who was unable to see or breathe and was caught in the gas. The DPD officers did not close any of the streets and their actions pushed protestors into active oncoming traffic. Ms. Fitouri and Ms. Parkins left the protest on or around 10:30 p.m., after experiencing significant exposure to tear gas fired by DPD officers very close to their persons. DPD officers used pepper balls, teargas, and flash-bang grenades on protestors consistently throughout the evening and were still using pepper balls, tear gas, and flash-bang grenades at the time Ms. Fitouri and Ms. Parkins left. The DPD officers used pepper balls, tear gas, and flash-bang grenades across Colfax Avenue while the street was filled with traffic waiting at the red

light. Many cars had pepper balls, tear gas, and flash-bang grenades hit their cars or the ground immediately next to the cars. On the evening of May 29, 2020, Ms. Fitouri and Ms. Parkins also observed that DPD officers indiscriminately shot tear gas and/or pepper balls at the entire group of protestors anytime protestors moved within approximately fifteen feet of the Officers. DPD officers never gave any warnings or dispersal orders before shooting tear gas and/or pepper balls at protestors. DPD officers shot tear gas and/or pepper balls at peaceful protestors who were kneeling on many occasions. Many of these protestors had their hands in the air and their shirts off. At many points in the evening of May 29, 2020, when Ms. Fitouri and Ms. Parkins and other peaceful protestors were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," DPD officers fired flash-bang grenades, tear gas, and pepper balls into the crowd indiscriminately and without warning or orders. On the evening of May 30, 2020, Ms. Parkins saw DPD officers hanging off the sides of police trucks and shooting at protestors as fast as they could. On or around 4:00 p.m., Ms. Fitouri and Ms. Parkins arrived at the Capitol building for the evening protests prior to the start of curfew. They began at the west steps of the Capitol building. Before curfew that day, a DPD officer on Colfax north of the protestors threw a flash-bang grenade into the crowd, which exploded at Ms. Fitouri's foot. Ms. Fitouri's foot went numb and she suffered minor burns. The DPD officers had also shot tear gas, flash-bang grenades, and/or pepper spray into the crowd of protestors without warning or dispersal orders. A friend of Ms. Fitouri's and Ms. Parkins's was very badly gassed. There was no warning about enforcement of the curfew before the curfew. Instead, at 8:00 p.m., DPD officers came out of the Capitol building and launched tear gas, flash-bang grenades, and/or pepper spray at the protestors, including Ms. Fitouri and Ms. Parkins, indiscriminately and without warning or dispersal orders. Ms. Fitouri and Ms. Parkins then marched with a group of protestors. Southeast

40

of the Capitol, DPD officers began shooting pepper balls at the protestors without warning or giving any dispersal or other orders. Ms. Fitouri and Ms. Parkins were with a group of approximately 30 people who ran into an alley in order to avoid being hit. DPD officers chased the protestors both on foot and on SWAT vehicles into the alley in order to trap them and continue shooting at them. Ms. Fitouri was hit with pepper balls. Eventually, Ms. Fitouri and Ms. Parkins were able to get to their cars to leave. At the time that Ms. Fitouri and Ms. Parkins were present in public places in Denver after curfew on May 30, 2020, the DPD officers "enforced" the curfew against them and other protestors by shooting pepper balls or throwing tear gas at them and/or chasing them into alleys in order to use "less-lethal" weapons on them. The DPD officers did not give any warnings or dispersal orders and appeared only interested in intimidating and punishing protestors with their "less-lethal" weapons. Ms. Fitouri and Ms. Parkins saw many non-protestors present in public places in Denver after curfew on May 30, 2020 who were ignored by the DPD officers and were not shot at, tear gassed, pepper sprayed, or arrested. After they left the protest, Ms. Fitouri and Ms. Parkins returned to their place of work at 15th Avenue and Grant Street where their cars were parked, in order to go home. They were standing in a private parking lot of their workplace. A group of protestors came by. Suddenly, one or more police vehicles screeched to a halt, many DPD officers got out of their vehicles and began shooting pepper balls and/or tear gas at the protestors without warning or dispersal orders. Ms. Fitouri and Ms. Parkins attempted to hide behind their own vehicles. The DPD officers shot at them and other protestors running through the parking lot from approximately 20 feet away. On May 31, 2020, in the early evening, Ms. Fitouri and Ms. Parkins met at the Capitol to join the protest, which was peaceful. They marched with the other protestors. After the 8:00 p.m. curfew, when Ms. Fitouri and Ms. Parkins and the protestors marched by the police precinct on

Washington and Colfax, DPD officers intentionally allowed half the group to pass and then began tear gassing, flash-banging, and pepper spraying the middle of the protest march. There were likely several thousand protestors in the march at this time. One of their friends was hit three times with tear gas canisters, once in his head, once in his back, and once in his hand. He was seriously injured and immediately left to seek treatment at a nearby hospital. At one point on that evening, Ms. Fitouri and Ms. Parkins were near the Basilica at 15th Avenue and Grant Street with at least one hundred other protestors. DPD officers kettled the protestors. Indiscriminately and without warning or orders, DPD officers shot tear gas, flash-bang grenades, and pepper balls into the crowd from every direction. It was difficult for protestors to escape. On days when they attended protests in Denver and during the events described above, Ms. Fitouri and Ms. Parkins experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. Ms. Fitouri and Ms. Taylor sued Denver for its violation of their constitutional rights. After a three-week trial, a federal jury found that Denver violated their First and Fourth Amendment rights and awarded them $1,000,000 each.

70.     Denver has not disciplined any officers for the above-outlined incidents. They have provided no additional training to officers who used the above-outlined force against peaceful protesters. This is indicative of Denver's customs, policies, practices, and training that condones the above-described force by its officers against peaceful protesters.

**DPD officers customarily used indiscriminate force against protesters, and those assumed to be protesters, without warning in the months prior to the use of force against Mr. Roberts.**

**May 28, 2020**

71.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 28, 2020.

72.     DPD officers also brutalized a group of protesters gathered near the intersection of 14th Avenue and Sherman Avenue. Protesters at this intersection encountered a line of DPD officers and stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protesters walked down 14th Avenue and joined this group of protesters. There were approximately 200 people. The officers tear gassed the entire crowd, without provocation or warning.

73.     DPD officers also brutalized an entire group of protesters near the Capitol building at about 6:30 p.m. At that time, DPD officers started launching tear gas canisters into a crowd of protesters without warning. At least one young man was hit with a canister. As soon as DPD officers launched the tear gas, the officers hopped on the back of a patrol van and drove away. Around 8 p.m., DPD officers returned to the Capitol building and formed a line. They slowly began advancing toward the protesters at the Capitol building. Without provocation or warning, the DPD officers launched tear gas at the crowd. At about 8:30 p.m., a crowd of protesters that was pushed down a street near the Capitol by DPD officers was tear gassed without any warning. At about 9 p.m., the crowd at that time was mostly seated on the Capitol steps talking amongst themselves. Then, without any warning or order to disperse, DPD officers deployed tear gas toward, and into, the crowd.

74.     Later that same night, DPD officers indiscriminately shot peaceful protesters with KIPs, including pepper balls and foam bullets.

**May 29, 2020**

75.     DPD officers used indiscriminate and excessive force against protesters gathered at the Capitol building on May 29, 2020. In the evening, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" DPD police cars drive through the group and released tear gas and shot KIPs from the vehicles at peaceful protesters.

76.     Around approximately 4 p.m., DPD officers began firing KIPs, including rubber bullets and pepper balls, into the crowd of peaceful protesters every few minutes. They also threw grenades indiscriminately into the crowd every couple of minutes, which made deafening sounds. Protesters were not throwing any objects at officers or otherwise provoking the police violence that was visited upon them. After about an hour, DPD officers formed a riot line and crossed the street towards the protesters, shooting more pepper balls and rubber bullets. When this did not disperse the crowd, DPD officers released tear gas.

77.     There was no warning about enforcement of the curfew (which was newly implemented) before the curfew began. Instead, at 8:00 p.m., DPD officers came out of the Capitol building and launched tear gas, grenades, and/or pepper spray at the protesters indiscriminately and without warning or dispersal orders

78.     Around 8 p.m., DPD officers also shot projectiles directly at the cellphone of one protester who was using it to record and broadcast police violence to her thousands of social media followers, shattering it. Shortly after police shot this protester's phone, they deployed tear gas into the group of protesters without any warning or justification.

79.     At approximately 9 p.m., DPD officers set up a line of about ten canisters of tear gas in front of the Capitol building and set them off. DPD officers did not issue a warning before any of these weapons were used.

80.     Throughout the evening, DPD officers indiscriminately shot tear gas and KIPs at the entire group of protesters anytime any single protester moved within approximately 15 feet of the officers. DPD officers never gave any dispersal orders or warning before indiscriminately shooting protesters with KIPs or tear gas throughout the evening.

81.     Officers shot tear gas and KIPs at peaceful protesters who were kneeling on many occasions. Many of these protesters had their hands in the air and their shirts off. At many points, when peaceful protesters were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," DPD officers fired grenades, tear gas, and KIPs into the crowd indiscriminately and without warning.

**May 30, 2020**

82.     DPD officers used indiscriminate and excessive force against protesters gathered at or near the Capitol building on May 30, 2020. In the afternoon, DPD officers sprayed tear gas over a large area by the Capitol occupied by predominantly peaceful protesters, including children. In response to a solitary protester tossing a water bottle toward the police, DPD officers deployed tear gas without first issuing a warning. At about 3:30 p.m., DPD officer shot pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, DPD officers shot more pepper balls as well as grenades at protesters. Other DPD officers pulled a boy's goggles and mask off of his face before spraying him in the face with pepper spray. At 4 p.m., the crowd attempted to march north toward a line of officers at the Civic Center transit station, and, in response, DPD officers deployed tear gas into the crowd without warning. At the same

time, DPD officers dressed in riot gear standing near a DPD surveillance truck shot canisters of tear gas into the crowd. DPD officers did not offer a warning before firing the tear gas. No protester was being violent in any way, or threatening property destruction.

83.     Later, at about 5:30 p.m., there was a large crowd gathered outside of the Capitol building. A number of the peaceful protesters were on their knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and KIPs at the crowd without giving any warning. Shortly thereafter, officers shot protesters with KIPs, including rubber bullets, again.

84.     At about 7 p.m., officers formed a single file line and encircled Civic Center Park, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, one protester began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. As that protester was talking to other protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed that protester directly in his face with pepper spray. The DPD officer did not give any warning before spraying the pepper spray in his face.

85.     At about 7:50 p.m., ten minutes before the just-enacted 8 p.m. curfew, numerous protesters attempted to leave the Capitol area to head to their cars, but DPD officers had barricaded the exits, trapping them. Approximately five minutes later, while the peaceful protesters were still trapped and before the curfew began, officers sprayed tear gas into the crowd, again without warning or an order to disperse.

86.     At approximately 9 p.m., DPD officers started pushing protesters out of the Capitol building area. Officers began using teargas and shooting projectiles indiscriminately at the crowd, including at women and children. There was no provocation or threatening behavior by the crowd, and no warnings from the officers before they shot the projectiles. Later into curfew, DPD officers continued to use indiscriminate force without warning. This included pepper-spraying individuals who were standing on their own property and shooting individuals with KIPs who yelled, from their front porches, for the officers to leave the neighborhood.

87.     Throughout the night, after curfew, there were roving gangs of DPD officers in riot gear, hanging off of vans and pickups trucks, driving around shooting protesters with KIPs. These officers were randomly, and indiscriminately, drive-by shooting citizens who were outside in the areas near the Capitol, in the Capitol Hill neighborhood, and on and around Broadway. There were no warnings given before these DPD officers shot KIPs and tear gas canisters at protesters and bystanders alike.

**May 31, 2020**

88.     DPD officers used indiscriminate and excessive force against protesters gathered at or near the Capitol building on May 31, 2020. In the evening, while peaceful protesters were chanting and marching on the streets surrounding the Capitol, and some protesters at the front of the march were lying down in the street like George Floyd (but none were throwing items or being violent), DPD officers gassed the protesters without warning. Later, at about 9:30 p.m., a group of approximately 250 peaceful protesters were marching near the Capitol. Without warning, four SWAT cars pulled in on both sides of the marching crowd, "kettling" them between two side streets. The DPD officers in the SWAT vehicles released tear gas from both directions without warning. Most protesters remained trapped in the cloud of gas.

89.     After curfew, DPD officers consistently trapped peaceful protesters in corners or between lines of officers, so that they could pelt them indiscriminately with KIPs.

**June 1, 2020**

90.     DPD officers used indiscriminate and excessive force against protesters gathered at or near the Capitol on June 1, 2020. Throughout the day and into the night, the protest was completely peaceful. At about 8:00 p.m., there were approximately 100 peaceful protesters in front of the Capitol. DPD officers formed a line and began pushing the peaceful crowd into the street and other officers surrounded the peaceful protesters on all sides. Once the protesters were successfully kettled, DPD officers released tear gas without warning. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape.

91.     Around midnight, dozens of DPD officers came out of the shadows at the Capitol building, and a group of protesters began chanting, "Why are you in riot gear, I don't see no riot here." Protesters lay down in the street with other people linking arms. There were also protesters demonstrating against the police in a line. DPD officers began marching onto the lawn. Without any warning or dispersal order or any words, the DPD officers began tear-gassing the demonstrators. DPD officers also used a noise cannon without warning.

92.     As a result, a number of individuals who were attending the protests as medics left the protest. The group of medics that fled encountered approximately 50 DPD officers at the intersection of Lincoln and Broadway. DPD officers surrounded the medics, pushed them into a corner and began dousing them with pepper spray. The medics in front were wearing gear clearly identifying them as medics.

**June 2, 2020**

93.     DPD officers used indiscriminate and excessive force against protesters gathered on June 2, 2020. That night, DPD officers again released tear gas into the crowd of protesters without warning and shot KIPs, including pepper balls, at protesters. DPD officers utilized the same tactics they had used the previous five nights.

**Defendant Chief Pazen and Mayor Michael Hancock ratified DPD officers' use of grossly excessive force and violation of protesters' free speech rights.**

94.     On the morning of May 29, 2020, Defendant Pazen and Mayor Michael Hancock held a press conference. During that press conference, Defendant Pazen and Mayor Hancock praised and explicitly condoned DPD officers' use of grossly excessive force, that was widely reported in the media and otherwise, during the first two days of the protests in the summer of 2020. Defendant Pazen and Mayor Hancock stated, at least a half dozen times, during the press conference that their observations were that the DPD officers had used "restraint" during their response to the first two days of the protests, despite there being large amounts of evidence that DPD officers had systematically used excessive force against protesters.  Such official statements from the Mayor and Defendant Pazen confirmed that the conduct of the DPD officers as described herein were pursuant to and consistent with the City's official policies, training, customs and practices.

95.     DPD officers, knowing that the Mayor of Denver and Defendant Pazen had condoned their policing of the first two days of the protests during the summer of 2020 (including their use of excessive force and retaliation against peaceful protesters), thereafter continued to use grossly excessive force against protesters, including Plaintiff, to retaliate against them for exercising their right to gather and protest police brutality.

96.     Defendant Pazen's and Mayor Hancock's decision to condone the use of excessive force and retaliation by DPD officers sent a message to Defendant John Doe that he was authorized to use excessive force and retaliate against Plaintiff. Defendant Pazen's and Mayor Hancock's actions, and Denver's actions, caused the violation of Plaintiff's Constitutional rights.

97.     After the conclusion of the protests at the end of May and beginning of June, Defendant Pazen abjectly failed to discipline DPD officers who engaged in excessive force, including those officers who used force against the individuals outlined above in paragraphs 41-69. This failure to discipline DPD officers for violating the rights of protesters sent the message to DPD officers, including Defendants Does 1-3, that they could use force against protesters, like Plaintiff, with impunity.

**Federal Judge R. Brooke Jackson held that Denver's actions against Black Lives Matter protesters, like Mr. Roberts, violated the Constitution.**

98.     On Thursday, June 4, 2020, four persons who had participated in the Denver protests since they began sued Denver, alleging that DPD officers' use of "less-lethal" weapons violated the First and Fourth Amendments. After a hearing on the matter, United States District Court Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order restricting DPD and officers from jurisdictions invited by DPD from using "less-lethal" projectiles and chemical agents on peaceful protesters. *See Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020).

99.     In doing so, Judge Jackson noted that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented,

Judge Jackson was unequivocal about the behavior of DPD officers toward protesters, calling it "disgusting."

100.    Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc.… solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protesters." Judge Jackson found it particularly problematic that "officers specifically aimed at heads and groins, causing broken facial bones and ruptured testicles." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

101.    Judge Jackson also held that there was a "strong likelihood" that DPD officers had violated the First Amendment in their treatment of peaceful protesters. In doing so, he found that: (1) the protesters "were engaged in constitutionally protected activity through organized political protest"; (2) DPD officers' "use of excessive force likely caused injury sufficient to chill a person of ordinary firmness from continuing to engage in that political protest" because "[o]fficers used physical weapons and chemical agents to prevent not just peaceful demonstration, but also the media's ability to document the demonstrations and plaintiffs' and third parties' ability to offer aid to demonstrators" resulted in "[p]eaceful demonstrators' legitimate and credible fear of police retaliation" that was "silencing their political speech—the very speech most highly valued under the First Amendment."

102.     Judge Jackson also made it a point to note that although he did "not agree with those who have committed property damage during the protests, property damage is a small price to pay for constitutional rights—especially the constitutional right of the public to speak against widespread injustice. If a store's windows must be broken to prevent a protestor's facial bones from being broken or eye being permanently damaged, that is more than a fair trade. If a building must be graffiti-ed to prevent the suppression of free speech, that is a fair trade. The threat to physical safety and free speech outweighs the threat to property."

103.     Ultimately, Judge Jackson issued a temporary restraining order **banning** DPD officers, and those under their command, from shooting KIPs "indiscriminately into a crowd." Judge Jackson also ordered that DPD were **required** to issue an order to disperse prior to using any chemical agents and that that order had to be followed "with adequate time for the intended audience to comply" and allow for egress.

**Denver abjectly failed to adequately train DPD officers and supervise DPD officers prior to the summer of protests in 2020.**

104.     After the protests in the summer of 2020, DPD Lieutenant John Coppedge was interviewed by Denver's Independent Monitor Nick Mitchell. Lieutenant Coppedge was a part of DPD's training academy. During that interview, Lieutenant Coppedge told Independent Monitor Mitchell that he saw DPD's response to the protests in the summer of 2020 as a total leadership failure. Lieutenant Coppedge told Mr. Mitchell that the officers on the ground were reacting to what they saw without any sort of leadership during the protests. Lieutenant Coppedge also revealed to Mr. Mitchell that under Defendant Pazen's administration, the prevailing attitude is that training is not important.

105.    Defendant Pazen deployed DPD officers into the streets to engage in crowd control situations knowing that they did not have proper training. By doing so, it was obvious to him that his officers would violate the rights of protesters like Plaintiff.

106.    Mr. Mitchell also spoke to DPD Sergeant Erik Knutson after the protests in the summer of 2020. Sergeant Knutson told Mr. Mitchell that he worked hard to develop a three-day field force operations class in 2015 and that in 2015 and 2016 he trained DPD officers using that field force operations class. However, in mid-2016, DPD decided that it would no longer provide field force training because it was too time intensive. Sergeant Knutson informed Mr. Mitchell that from what he observed of the DPD response to protests in the summer of 2020, the tactics used by DPD were not anything that would be taught in training. This included the repeated decision by officers to not utilize their batons to move crowds of people, and instead move crowds using pepper balls; Sergeant Knutson told Mr. Mitchell that there was a significant overreliance on pepper balls during the protests in the summer of 2020.

107.    Another officer, Jesse Trudel, spoke about the lack of training for line officers during an IA interview after the protests in the summer of 2020. Officer Trudel said that he only received field force training in the academy, and that amounted to only between four and eight hours of training. Officer Trudel said most of the training focused on how to properly don gear and gas masks, and that they only conducted an hour of field force training

108.    DPD Captain Sylvia Sich was also interviewed by Denver's Independent Monitor Nick Mitchell. During that interview, Captain Sich told Mr. Mitchell that she believed that a lot of the protesters were injured by DPD officers due to a lack of supervision provided to the DPD officers by command staff, including Defendant Pazen.

109.     Captain Sich told Mr. Mitchell that, during the protests in the summer of 2020, Defendant Pazen would "lose[] it" if he was presented with an opinion different from his own on how the protests should have been handled. Captain Sich also told Mr. Mitchell that Defendant Pazen was "paralyzed" during the protests in the summer of 2020.

**Denver's Independent Monitor, in a comprehensive report about the DPD response to the protests in the summer of 2020, found that Denver's customs, practices, lack of training, and absence of supervision violated policing standards.**

110.     In a report titled "The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review" ("Independent Monitor Report") Denver's Independent Monitor, Nick Mitchell, outlined his findings after reviewing over two hundred hours of body-worn camera footage along with all other documentation preserved by Denver along with having access to over fifteen thousand hours of HALO camera footage. Mr. Mitchell's team also interviewed DPD officers, as outlined above, as part of the investigation. The report was released on December 8, 2020.

111.     In the Independent Monitor Report, Mr. Mitchell found, during the protests in the summer of 2020:

a.   DPD officers routinely failed to issue dispersal orders before using force to disperse crowds. Even when DPD officers did issue dispersal orders, those orders lacked information about dispersal routes and did not warn protesters that by remaining they would be subjected to force. Often, DPD officers failed to allow enough time and space for protesters to comply even if they wanted to.

b.   DPD officers routinely were allowed to deploy pepper balls without the proper training and certification on using pepper ball launchers and the appropriate circumstances for using pepper balls.

c.  DPD lacked internal controls on the use of force that could have allowed command staff, including Defendant Pazen, to review uses of force while the events were unfolding. The lack of these controls prevented command staff from ensuring, in real time, that force was being used in conformity with DPD policies and training.

d.  DPD officers deployed pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin area.

e.  DPD officers deployed pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance.

f.  DPD officers deployed less-lethal munitions in ways that were extremely troubling.

g.  DPD officers continued to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area.

h.  DPD's policy about when it was appropriate to directly fire a pepper ball at a member of a crowd was too low, allowing officers to directly fire pepper balls at individuals who were doing nothing more than disrupting traffic during the protests in the summer of 2020. In other words, Denver's policies relating to the use of pepper balls was directly responsible for DPD officers using pepper balls as a disproportionate use of force.

i.  DPD officers on the ground received little guidance from an on-the-ground field commander.

j.    DPD had not made enough recent investments in crowd control and field force operations training to properly prepare officers for an event like the protests in the summer of 2020.

k.    Supervisors throughout the DPD received insufficient direction in the field and sometimes did not know who the appointed Operations Chief was on a particular day. This led to a lack of clarity among officers about their strategic objective, which led to confusion about when to advance on, retreat from, or hold specific pieces of ground in downtown Denver.

l.    DPD devoted less attention to crowd control training in the years immediately preceding the protests in the summer of 2020, which was reflected in the volume and frequency of crowd control and field force training in the years leading up to the protests in the summer of 2020.

112.    Ultimately, Mr. Mitchell issued a lengthy list of recommendations for policing of future protests, which were not followed during the protests in the summer of 2020, that would have prevented the mass injuries inflicted by DPD officers and prevented the violation of the Constitutional rights of protesters. Many of these recommendations were obvious, as they were based on widely known policing standards that every police department in the nation, including DPD, is aware of.

**A federal jury found that Denver's policies, customs, practices, and training violated protesters' Constitutional rights.**

113.    In March of 2022, there was a trial in the United States District Court for the District of Colorado involving claims that DPD officers had used excessive force that violated the free speech rights of a group of eleven protesters who were shot with KIPs and subjected to flash-bangs during the protests in the summer of 2020 in Denver. The plaintiffs in the *Epps v.*

*Denver* case claimed that Denver was liable for the violation of their rights because its officers violated their rights in accordance with the policies, customs, practices, and training of Denver.

114.    During the *Epps v. Denver* trial, Independent Monitor Mitchell testified that DPD deployed less-lethal munitions in ways that were extremely troubling. Specifically, Mr. Mitchell saw "DPD officers deploying OC spray and PepperBall rounds at persons who were only verbally objecting to police behavior, and not engaged in any apparent physical resistance" and that officers regularly deployed "PepperBall rounds and other projectiles at prohibited areas of the body, including the head, face, and groin areas."

115.    Mr. Mitchell also testified that officers continued "to deploy chemicals, gas, impact, or explosive munitions after their initial deployments had already caused people to disperse and leave an area" and that he regularly observed DPD officers throw "explosive devices at or extremely close to individuals, sometimes resulting in people being knocked to the ground with apparent injuries."

116.    Mr. Mitchell testified that he "frequently" heard from DPD officers "that they felt a need for greater emphasis on training in crowd management and field force operations." Mr. Mitchell stated that some officers who were not certified on PepperBall and 40mm were given those weapons at the protest. Mr. Mitchell also said that DPD did not train with its mutual-aid partners and never worked with outside jurisdictions on crowd control.

117.    During the *Epps v. Denver* trial, DPD Commander Patrick Phelan testified under oath that he had not seen any video or documentation relating to the protests in the summer of 2020 that showed DPD officers using force on protesters in a manner inconsistent with Denver's policy, training, and practice.

118.     After the three-week trial, a federal jury returned a verdict finding that DPD officers had violated each protester's First and Fourth Amendment rights. The jury also found that Denver's policies, practices, and customs caused the violation of the plaintiffs' rights. Additionally, the jury returned a verdict finding that Denver's failure to train its officers caused the violation of the plaintiffs' rights. Finally, the jury issued a finding that Denver had ratified its officers' violation of plaintiffs' rights, and that ratification had caused the violation of plaintiffs' rights.

119.     After finding Denver and one DPD officer liable, the jury awarded the plaintiffs a total of $14,000,000.

**Denver condoned its officers' actions during the protests in the summer of 2020.**

120.     The protests in the summer of 2020spawned at least one hundred and eleven complaints that DPD officers violated the Constitutional rights of protesters and bystanders. Of the one hundred and eleven internal affairs investigations opened by DPD as a result of the protests in the summer of 2020, only three cases resulted in discipline for officers. Denver's widespread decision to condone the actions of DPD officers during the protests demonstrates that DPD officers' actions, including the actions of Defendant Doe, were consistent with the customs, policies, and practices of DPD that existed prior to, and at the time of, the protests in the summer of 2020.

121.     Upon information and belief, Defendant Doe has not been disciplined for his use of force against Plaintiff in accordance with the custom and practice by Denver of condoning excessive force by its officers during the protests in the summer of 2020.

**Denver's customs, policies, practices, training, and supervision caused the violation of Plaintiff's Constitutional rights.**

122.   DPD officers' customary and ongoing use of chemical munitions to target protesters for demonstrating shows that Denver failed to adequately train their officers that KIPs, including Stinger Ball grenades and pepper balls, cannot be used for the purpose of discouraging First Amendment activity, to punish those who engage in First Amendment activity, or to retaliate against those who engage in First Amendment activity.

123.   Denver final policymakers, including Defendant Pazen, have received ample notice that DPD officers were using chemical munitions against protesters to control and suppress demonstrations in the absence of any imminent threat to safety, including 150 complaints about the DPD in one 72-hour period,[2] condemnation from City Council members, and widely publicized videos and firsthand accounts circulated through the local, state, and international press.[3]

124.   Denver decision makers also knew that the actions of DPD officers in Denver against protesters violated the policies and procedures for the use of force outlined in the DPD's own Operations Manual, but condoned them nonetheless.

---

[2] Jesse Paul, *Complaints about police response to Denver's George Floyd protests under investigation as demonstrations hit day 6*, Colo. Sun, June 2, 2020, https://coloradosun.com/2020/06/02/denver-police-response-protests-under-investigation/.
[3] Lori Jane Gliha, *Police projectile fractures Denver protester's face; she says it was unprovoked*, KDVR, June 3, 2020, https://kdvr.com/news/local/police-projectile-fractures-denver-protesters-face-she-says-it-was-unprovoked; Alex Rose, *Local man needs eye removed after projectile hits his face during afternoon protest in Denver*, KDVR, June 3, 2020, https://kdvr.com/news/local/local-man-needs-his-eye-removed-after-projectile-hits-his-face-during-afternoon-protest-in-denver/?fbclid=IwAR2Q9RdYRmi3dp5GnuyOf6Tm6E-NoquhzKTvHSknBTmUKLuZ-17UIc4YJkA.

125.    The violations of Plaintiff's constitutional rights are a direct result of and caused by Denver's policy, practice, and custom of authorizing DPD officers to use chemical munitions without warning against peaceful protesters.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Freedom of Speech and Assembly

126.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

127.    Defendants, acted under color of state law, and within the course and scope of their employment, in their capacities as officers of the DPD at all times relevant to the allegations in this Complaint.

128.    Defendants are "persons" under 42 U.S.C. § 1983.

129.    Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

130.    The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

131.    Plaintiff's expression was on a matter of public concern and did not violate any law.

132.    Plaintiff's expression occurred at a traditional public forum.

133.    Plaintiff assembled with others at a traditional public forum to express shared concerns about police brutality.

134.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression and assembly.

135.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

136.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

137.    At the time when Defendants stopped Plaintiff from speaking and gathering, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to gather, express himself, and speak freely. Any reasonable law enforcement officer knew or should have known of this clearly established right.

138.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

139.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

140.    Defendant Denver has a custom, practice or policy of tolerating violations of the First Amendment of the United States Constitution.

141.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

142.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

143.    Defendant Denver failed to properly supervise and/or train its officers.

144.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

145.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

146.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### First Amendment Violation — Retaliation

147.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

148.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

149.     Defendants are "persons" under 42 U.S.C. § 1983.

150.     Plaintiff was engaged in First Amendment-protected expression by gathering to protest police brutality.

151.     The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

152.    Plaintiff's expression was on a matter of public concern and did not violate any law.

153.    Plaintiff's expression occurred at a traditional public forum.

154.    Defendants jointly and on their own accord responded to Plaintiff's First Amendment protected activity with retaliation, including but not limited to use of physical force, including chemical agents.

155.    By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence her, and to deter her from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment protected activity.

156.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

157.    At the time when Defendants retaliated against Plaintiff for exercising his First Amendment rights, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to be free from retaliation. Any reasonable law enforcement officer knew or should have known of this clearly established right.

158.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

159.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

160.    Defendants stopped Plaintiff from engaging in expressive activity in accordance with the customs, policies, and practices of Defendant Denver.

161.     Defendant Denver has a custom, practice or policy of tolerating its officers' retaliatory violations of the First Amendment of the United States Constitution.

162.     Defendant Denver failed to properly supervise and/or train its officers.

163.     The actions of Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

164.     Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

165.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

166.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

167.     Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth Amendment Violation — Excessive Force

168.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

169.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

170.     Defendants are "persons" under 42 U.S.C. § 1983.

171.     Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

172.     Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

173.     Defendants unlawfully seized Plaintiff by means of excessive physical force, including the use of chemical agents.

174.     Defendants had no warrant authorizing any seizure of Plaintiff.

175.     Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights and is thereby liable for such failure to intervene.

176.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

177.     Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed Plaintiff had committed any crime) that would legally justify arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

178.     Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

179.     Defendants recklessly created the situation in which they used force.

180.     Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

181.    At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

182.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

183.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

184.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

185.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

186.    Defendant Denver failed to properly supervise and/or train its officers.

187.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

188.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

189.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by

66

the Constitution of the United States of America.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation — Due Process

190.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

191.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the DPD at all times relevant to the allegations in this Complaint.

192.    Defendants are "persons" under 42 U.S.C. § 1983.

193.    Defendants failed to issue orders before using force against Plaintiff.

194.    Defendants failed to issue any dispersal order prior to using force against Plaintiff. Prior to using force, due process requires that a protester be given warning and an opportunity to leave the area through unobstructed paths of egress. Defendants did not provide Plaintiff with this constitutionally required notice and opportunity to disperse.

195.    Defendants failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

196.    The orders issued by Defendants, and the authority on which those orders were based, failed to provide people of ordinary intelligence a reasonable opportunity to understand what conduct they prohibited, and authorized or encouraged arbitrary and discriminatory enforcement, or both.

197.    At the time when Defendants violated Plaintiff's due process rights, Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States

Constitution to be afforded due process of law. Any reasonable law enforcement officer knew or should have known of this clearly established right.

198.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

199.    The actions of the Defendants were authorized (before and during the fact), and ratified (after the fact), by final policymakers for Defendant Denver.

200.    Defendant Denver's customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

201.    Defendant Denver failed to properly supervise and/or train its officers.

202.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

203.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

204.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## FIFTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 10 — Freedom Of Speech
### (Plaintiff against Defendants Pazen and Does 1-3)

205.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

206.    Defendant Does acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

207.    Defendant Does are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

208.    The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

209.    The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

210.    Plaintiff was engaged in free speech activity.

211.    The actions of Defendant Does – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by Colo. Const. Art. II, Section 10.

212.    Plaintiff's expression was on a matter of public concern and did not violate any law.

213.    Plaintiff's expression occurred at a traditional public forum.

214.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

215.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

216.    Defendants responded to Plaintiff's Colo. Const. Art. II, Section 10 protected activity with retaliation, including but not limited to use of physical force.

217.    Defendants Does 2-3 failed to intervene to prevent Defendant Doe from violating Plaintiff's free speech rights.

218.    By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his Colo. Const. Art. II, Section 10 rights, to silence him, and to deter him from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such Colo. Const. Art. II, Section 10 protected activity.

219.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his Colo. Const. Art. II, Section 10 rights.

220.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's Colo. Const. Art. II, Section 10 rights.

221.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

222.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

## SIXTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 24 — Right To Assemble And Petition
### (Plaintiff against Defendants Pazen and Does 1-3)

223.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

224.    Defendant Does acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

225.    Defendant Does are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

226.    The Assembly and Petition Clause to the Colorado Constitution provides that "[t]he people have the right peaceably to assemble for the common good, and to apply to those invested with the powers of government for redress of grievances, by petition or remonstrance." Colo. Const. Art. II, Section 24.

227.    The rights protected by Colo. Const. Art. II, Section 24 are more expansive than those protected by the First Amendment to the United States Constitution.

228.    Plaintiff was engaged in assembly and petitioning activity by gathering for the counter-protest.

229.    Defendants' actions were a content- and/or viewpoint-based restriction on speech, association, and assembly.

230.    The actions of Defendants – specifically, the use of excessive force against peaceful protesters – can be expected to chill a reasonable person from engaging in activity protected by Colo. Const. Art. II, Section 24.

231.    Plaintiff's assembly was related to a matter of public concern and did not violate any law.

232.    Plaintiff's assembly occurred at a traditional public forum.

233.    Defendants' actions were not a reasonable time, place, and manner restriction.

234.    Defendants responded to Plaintiff's Colo. Const. Art. II, Section 24 protected activity with retaliation, including but not limited to use of physical force.

235.    Defendants Does 2-3 failed to intervene to prevent Defendant Doe from violating Plaintiff's assembly and petitioning rights

236.    By unlawfully using force against Plaintiff, Defendants sought to punish Plaintiff for exercising his Colo. Const. Art. II, Section 24 rights, to silence him, and to deter him from gathering and speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such Colo. Const. Art. II, Section 24 protected activity.

237.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his Colo. Const. Art. II, Section 24 rights.

238.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's Colo. Const. Art. II, Section 24 rights.

239.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

240.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

## SEVENTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 7 — Excessive Force
### (Plaintiff against Defendants Pazen and Does 1-3)

241.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

242.    Defendant Does acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

243.    Defendant Does are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

244.    Plaintiff had a protected interest under Colo. Const. Art. II, Section 7 against being victimized by the use of excessive force at the hands of law enforcement personnel.

245.    Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

246.    Defendants unlawfully seized Plaintiff by means of excessive physical force.

247.    Defendants had no warrant authorizing any seizure of Plaintiff.

248.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

249.    Defendants Does 2-3 failed to intervene to prevent Defendant Doe from using excessive force against Plaintiff.

250.    Plaintiff had committed no crime (nor could any Defendant have reasonably believed he had committed any crime) that would legally justify an arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

251.     Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

252.     Defendants recklessly created the situation in which they used force.

253.     Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

254.     Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally-protected rights.

255.     As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

256.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered, and other compensatory and special damages.

### EIGHTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 25 — Excessive Force
### (Plaintiff against Defendants Pazen and Does 1-3)

257.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

258.     Defendant Does acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

259.     Defendant Does are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

260.   Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against being unreasonably harmed by the use of excessive force at the hands of law enforcement personnel.

261.   Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

262.   Defendants unlawfully seized Plaintiff by means of excessive physical force.

263.   Defendants had no warrant authorizing any seizure of Plaintiff.

264.   Defendants' actions were objectively unreasonable in light of the circumstances confronting them

265.   Plaintiff had committed no crime (nor could any Defendants have reasonably believed he had committed any crime) that would legally justify an arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

266.   Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

267.   Defendants recklessly created the situation in which he used force.

268.   Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

269.   Defendants Does 2-3 failed to intervene to prevent Defendant Doe from using excessive force against Plaintiff.

270.   Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally-protected rights.

271.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

272.     Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered, and other compensatory and special damages.

## NINTH CLAIM FOR RELIEF
### C.R.S. § 13-21-131
### Colo. Const. Art. II, Section 25 — Due Process
### (Plaintiff against Pazen and Defendant Does 1-3)

273.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

274.     Defendant Does acted under color of state law, and within the course and scope of their employment, in their capacity as law enforcement officers at all times relevant to the allegations in this Complaint.

275.     Defendant Does are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

276.     Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law.

277.     Defendants failed to issue any dispersal order prior to using force against Plaintiff. Prior to using force, due process requires that a protester be given warning and an opportunity to leave the area through unobstructed paths of egress. Defendants did not provide Plaintiff with this constitutionally required notice and opportunity to disperse.

278.     Defendants Does 2-3 failed to intervene to prevent Defendant Doe from using excessive force against Plaintiff without any warning.

279.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally-protected rights.

280.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

281.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.    All appropriate relief at law and equity;

B.    Injunctive relief, including:

   a.    Enjoining Defendants from using chemical agents against those exercising their rights of free speech and assembly;

   b.    Requiring all Defendant law enforcement officers deployed to police demonstrations must have their body-worn cameras recording at all times, and forbidding officers from intentionally obstructing the camera or recording;

   c.    Requiring that all Defendant law enforcement officers deployed to police demonstrations must create a use of force report documenting every single deployment of munitions;

   d.    Requiring that warning be given prior to force being used against demonstrators;

    e.    Requiring that any and all orders to disperse must only be given when there is imminent danger of harm to persons (not property);

    f.    Requiring that any and all orders to disperse must be followed by adequate time for the intended audience to comply, and officers must leave room for safe egress; if it appears the intended audience did not hear the order, the order must be repeated multiple times before the crowd is dispersed.

C.    Declaratory relief and other appropriate equitable relief;

D.    Economic losses on all claims as allowed by law;

E.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

G.    Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

H.    Pre-and post-judgment interest at the lawful rate; and

I.    Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 14th day of July 2022.

KILLMER, LANE & NEWMAN, LLP

*/s/ Mari Newman*
Mari Newman
Andy McNulty
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Facsimile: (303) 571-1001
mnewman@kln-law.com

amcnulty@kln-law.com

ATTORNEYS FOR PLAINTIFF